UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ELLAN CORP., INC.,                                          :

                    Plaintiff,                         :          09 Civ. 00414 (LAP)(MHD)

       - against -                                      :          **DECLARATION
OF JAESOO LEE**

DONGKWANG INTERNATIONAL CO., LTD.,             :

                   Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DONGKWANG INTERNATIONAL CO., LTD.,             :

              Counterclaim-Plaintiff,     :

       - against -                                      :

ELLAN CORP., INC. and AMERICAN FASHION     :
BRANDS, LLC,
                              :
               Counterclaim-Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JAE SOO LEE declares, under penalty of perjury pursuant to 28 U.S.C. § 1746:

    1.   I am the President of Dongkwang International Co., Ltd. ("Dongkwang"), the defendant and counterclaim plaintiff in the above-captioned action  I am fully familiar with the matters hereinafter set forth and I make this declaration in support of Dongkwang's motion for summary judgment and in opposition of the motion by plaintiff and counterclaim defendant, Ellan Corp., Inc. ("Ellan") for summary judgment.

    2.   Dongkwang is a manufacturer and distributor of clothing merchandise and has approximately three hundred brick and mortar stores in South Korea.

3.  In or about June 2008, I was contacted by Shi Hyun Hong, an employee of Golden Bridge Financial Advisory Co., Ltd. ("Golden Bridge"), stating that he had access to new Victoria's Secret merchandise and wanted to show me a presentation of what he had to offer.

4.  A few days later, several of my employees and I met Shi Hyun Hong and his associate, Hyung Wook Kim, at their offices located in Samsung-Dong, Kangnam-Gu, South Korea.

5.  Shi Hyun Hong and Hyung Wook Kim made a business presentation on marketing and selling Victoria's Secret merchandise ("VS Merchandise") in South Korea and provided me with an accompanying information booklet.

6.  Shi Hyun Hong and Hyung Wook Kim informed me that they had the exclusive right to negotiate the sale of VS Merchandise in South Korea and that it would be possible for Dongkwang to become the official distributor of new VS Merchandise in South Korea.

7.  Shi Hyun Hong and Hyung Wook Kim stated that they were the agents of American Fashion Brands, LLC ("AFB"), the company that would be able to sell Dongkwang new VS Merchandise. AFB was described by them as the company that was in charge of Limited Brands, Inc.'s ("Limited") international distributorship and maintained warehouses for Limited overseas.

8.  Shi Hyun Hong and Hyung Wook Kim explained that a Chinese company, Shanghai Jintian Fashion Co., Ltd., was able to successfully enter into an agreement with AFB to be the exclusive distributor of VS Merchandise in China and that Dongkwang would be able to achieve similar success in South Korea.

9.  After reviewing the presentation materials and determining that selling new VS Merchandise in South Korea would be successful, I requested my employee, In Chul Lee, to begin negotiations with Golden Bridge to enter into an agreement with AFB to purchase new VS Merchandise.

2

10. In or about mid-June 2008, In Chul Lee began communicating with Hyung Wook Kim to negotiate the terms of a distributorship agreement with AFB. Throughout the course of the negotiations, In Chul Lee was responsible for providing me with the details and progress of the negotiations.

11. Hyung Wook Kim made representations to us that the VS Merchandise available would be "stockpile" goods that were at most three months old and that they would not be materially different from brand new VS Merchandise.

12. On or about July 15, 2008, Dongkwang discovered that AFB only managed outdated overstock VS Merchandise, and so I requested In Chul Lee to notify Hyung Wook Kim that such VS Merchandise would be unacceptable since it would not be competitive in the South Korean market. We made it clear to Hyung Wook Kim that we were only interested in purchasing new VS merchandise.

13. On or about July 17, 2008, Hyung Wook Kim informed us that another American company, Ellan Corp., Inc. would be substituted for AFB as the other company to the proposed distributorship agreement. Hyung Wook Kim represented to us that Ellan was Limited's official North American wholesaler and broker and that it had the authority to sell new and surplus VS Merchandise to Dongkwang. Hyung Wook Kim also stated that Ellan would be able to discuss with Limited the possibility of Dongkwang obtaining a license to sell new VS Merchandise in South Korea and that such arrangement would likely occur once VS Merchandise begins to sell in South Korea. Hyung Wook Kim stated that Golden Bridge was now acting as Ellan's agent and that Golden Bridge and Ellan were working together with an individual named Nanjala (a/k/a Rachel) Warman, who was also an agent for Ellan. At this time, Hyung Wook Kim

submitted to us a draft of a proposed distributorship agreement between Dongkwang and Ellan for Dongkwang's review.

14. One of Dongkwang's principal concerns in this connection was that Ellan would be authorized by Limited to enter into the proposed distributorship agreement. We knew that if Limited did not grant Dongkwang permission to import VS Merchandise into South Korea, Dongkwang would be exposed to a lawsuit for trademark violations. In addition, we continued to pursue the possibility of obtaining new VS Merchandise.

15. On or about July 28, 2008, Hyung Wook Kim informed Dongkwang that Ellan would sign a separate Memorandum of Understanding ("MOU") which would allow Dongkwang to purchase new VS Merchandise and grant Dongkwang a license to sell new VS Merchandise in South Korea. Hyung Wook Kim stated that Ellan requested that a separate MOU be used for this purpose instead of incorporating the terms for new VS Merchandise in the Distributorship Agreement.

16. On or about July 28, 2008, Dongkwang communicated to Hyung Wook Kim various issues that needed to be resolved before going forward with signing the proposed distributorship agreement. Hyung Wook Kim informed Dongkwang that Nanjala Warman had assured him on behalf of Ellan that these problems would be resolved.

17. Based on Hyung Wook Kim's representations that Ellan would be able to sell new VS Merchandise to Dongkwang, Hyung Wook Kim and In Chul Lee arranged an itinerary for Dongkwang to inspect Ellan's VS Merchandise in Ningbo, China and to travel to New York to execute the proposed distributorship agreement with Ellan. Pursuant to this itinerary, Dongkwang's representatives would be visiting the Ningbo, China warehouse with Golden Bridge's representatives on August 4, 2008, returning back to South Korea on August 5, 2008,

and flying to New York on August 7, 2008, to sign the proposed distributorship agreement on August 8, 2008.

18.  Before being allowed to inspect Ellan's VS Merchandise at AFB's warehouse in Ningbo, China, Dongkwang was required to open a letter of credit in the amount of approximately $575,000 and assign Ellan as the beneficiary.  On or about July 30, 2008, Dongkwang opened such letter of credit for the opportunity to inspect Ellan's VS Merchandise.

19.  On or about August 4, 2008, several of my employees and I visited the AFB Ningbo, China warehouse to inspect Ellan's VS Merchandise.  Upon examination of the VS Merchandise, we determined that it was all old (over three months old) merchandise.  We were also told that the items were organized only by size and that the VS Merchandise could only be ordered by size (and not color or style).

20.  Dongkwang knew that the VS Merchandise that we saw in the Ningbo, China warehouse during that visit would not be competitive in the South Korean market, and we immediately addressed our concerns about the merchandise to Hyung Wook Kim.

21.  On or about August 6, 2008, following the visit to AFB's facilities in China, In Chul Lee contacted Hyung Wook Kim to inform him of the problems with the VS Merchandise in the Ningbo warehouse and advised him that Dongkwang would not follow through with the proposed distributorship agreement unless the problems were properly addressed.  Dongkwang's demands in this regard were listed in In Chul Lee's email to Hyung Wook Kim dated August 6, 2008, a true and correct copy of which is annexed hereto as Exhibit A.

22.  Hyung Wook Kim communicated Dongkwang's demands to Nanjala Warman.  A true and correct copy of Hyung Wook Kim's email correspondence to Nanjala Warman in this regard is annexed hereto as Exhibit B.

5

23.  On or about August 7, 2008, Hyung Wook Kim contacted Dongkwang and stated that Ellan would be able to comply with Dongkwang's demands and that the language within the proposed distributorship agreement would be changed to reflect such demands.  Hyung Wook Kim represented that Ellan would definitely be able to provide Dongkwang with new VS Merchandise and "stockpile" VS Merchandise  (i.e., merchandise that is at most three months old).  Hyung Wook Kim further stated that Dongkwang's window of opportunity to enter into an agreement with Ellan would expire on August 8, 2008.

24.  Relying on Nanjala Warman's and Hyung Wook Kim's promises and representations, Dongkwang decided to follow through with the scheduled signing of the proposed distributorship agreement.

25.  That same day, I flew with several of my colleagues to New York.  At the request of Hyung Wook Kim, Dongkwang had purchased the airline tickets for Hyung Wook Kim, Shi Hyun Hong, and Nanjala Warman as they were the agents of Ellan and were assisting in negotiating the proposed distributorship agreement.

26.  Although Dongkwang's representatives were on the same flight as Hyung Wook Kim and Shi Hyun Hong, Nanjala Warman flew on a separate plane to the United States on the very same day.

27.  I arrived with my colleagues at the Millennium Hotel in New York on August 7, 2008.

28.  At approximately 10:00 a.m. the next morning, my colleagues and I met with Hyung Wook Kim, Shi Hyun Hong and Nanjala Warman at the Millennium Hotel's business center to make the final changes to the distributorship agreement.

29.  A draft of the proposed distributorship agreement was given to me and the other Dongkwang representatives for our review.  A true and correct copy of the draft is annexed hereto as Exhibit C.  This draft was exchanged by email between Hyung Wook Kim and Nanjala Warman at approximately 7:39 A.M (NYT) on the morning of August 8, 2008 in preparation for the morning meeting.  A true and correct copy of a stenographer's verification of this fact, produced in this action by Ellan, and a certified translation are annexed hereto as Exhibit D.

30.  Upon review of the draft, Dongkwang's representatives and I were surprised that the demands that we had made to Hyung Wook Kim the day before had not been included in the draft.  In particular, there were no assurances in the proposed distributorship agreement that (1) Limited authorized Ellan to enter into the agreement, (2) that Limited authorized Dongkwang to use Limited's trademark and/or trade name as set forth in the proposed agreement, or (3) that the initial 55,000 – 60,000 units of VS Merchandise would be new or like-new (i.e., merchandise manufactured within three  months) VS Merchandise.

31.  We requested that the aforementioned provisions be included in the proposed distributorship agreement.  Dongkwang requested Ellan to include as well a provision that new VS Merchandise be provided, but Nanjala Warman insisted on behalf of Ellan that such a provision could only be included in a separate MOU agreement.  Nanjala Warman represented to me at that time that the MOU would be effective as long as it was signed and that it would obligate Ellan to provide Dongkwang with new VS Merchandise in the future.  With respect to the initial purchase of 55,000 – 60,000 units of VS Merchandise, Nanjala Warman then assured me that Dongkwang would be able to select VS Merchandise that was manufactured within three months and that the distributorship agreement would so provide.  Hyung Wook Kim made all

three of the requested changes to the proposed distributorship agreement referred to in paragraph 30 above on his laptop computer as we discussed what needed to be changed.

32. After the meeting, which lasted approximately two hours, my colleagues and I had lunch at the hotel and returned to our room to prepare for the meeting with Ellan's President at AFB's office.

33. Hyung Wook Kim, Shi Hyun Hong and Nanjala Warman had left the meeting together and likely discussed and implemented the final changes that were to be made regarding the proposed distributorship agreement.

34. In my hotel room, one of my colleagues introduced me to Dae Ki Min, Esq., an American attorney, who performed a brief review of the proposed distributorship agreement and MOU.

35. Mr. Min, my colleagues and I then met Hyung Wook Kim and Shi Hyun Hong at the Millennium Hotel and walked to AFB's office at around 2:30 p.m. Nanjala Warman was not with Hyung Wook Kim and Shi Hyun Hong, and I was informed that she was already at AFB's offices with Rich Kim, the President of Ellan.

36. When my colleagues and I arrived at AFB office, I was introduced to Michael Sabe, the President of AFB, Rich Kim, and Han Kim (Rich Kim's brother). Accompanying them at the meeting was Nanjala Warman, Ellan's agent.

37. Nanjala Warman presented me with a revised draft of the proposed distributorship agreement. A true and correct copy of the revised draft is annexed hereto as Exhibit E. This draft was exchanged between Hyung Wook Kim and Nanjala Warman at approximately 2:10 P.M (NYT) that day. A true and correct copy of a stenographer's verification of this fact, which

was produced by Ellan during discovery in this action, and a certified translation are annexed hereto as Exhibit D.

38. We noticed that Sections 4.2 of the proposed distributorship agreement had been modified and Sections 12.9 and 12.11 had been added in response to our demands. Section 4.2, as modified, allowed Dongkwang to purchase VS Merchandise produced within three months[1]; new Section 12.9 contained an explicit representation and warranty that Ellan was authorized by Limited to enter into the proposed distributorship agreement; and new Section 12.11 stated that the distributorship agreement was conditioned upon Ellan delivering to Dongkwang a written authorization from Limited authorizing Dongkwang to use Limited's trademark and/or trade name in the manner and for the purposes stated in the agreement.

39. Nanjala Warman, Hyung Wook Kim and Shi Hyun Hong assured me and my colleagues that (i) Ellan had North American distribution rights for VS Merchandise, (ii) Ellan was authorized by Limited to enter into the proposed distributorship agreement and resell VS Merchandise thereunder, iii) Ellan had authority to sell and distribute VS Merchandise in South Korea, and (4) Ellan had the ability to obtain a license for Dongkwang to sell new VS Merchandise in South Korea.

40. Nanjala Warman, Ellan's representative, then specifically represented to me that Ellan had documentation from Limited recognizing its North American distributorship rights for VS Merchandise as well as documentation showing that Ellan was authorized by Limited to enter into the proposed distributorship agreement and resell VS Merchandise to Dongkwang. She

---

[1] Even if Dongkwang had an obligation to purchase 55,000-60,000 units (manufactured within three months), it was later established through Rich Kim's testimony at his deposition in this action that Ellan did not even own any VS Merchandise in AFB's warehouse in Ningbo, China or anywhere else at any point in time. See deposition of Rich Kim, dated May 10, 2010, p. 133, a true and correct copy of which is annexed hereto as Exhibit F. Thus, the only VS Merchandise that might have been available to Ellan was the much older VS Merchandise owned by AFB.

promised that such documents would be given to Dongkwang right after the proposed distributorship agreement was signed.

41.   Nanjala Warman told Dongkwang that it would be able to get a letter of authorization from Limited after Dongkwang purchased an initial 55,000 – 60,000 units of VS Merchandise.

42.   In this connection, Hyung Wook Kim and Nanjala Warman revised Section 12.11 of the proposed distributorship agreement, after which she printed out the final draft of the proposed distributorship agreement.   A true and correct copy of this revised draft is annexed hereto as Exhibit G.   This draft was exchanged between Hyung Wook Kim and Nanjala Warman at approximately 3:20 P.M. (NYT), in the afternoon of August 8, 2008.   A true and correct copy of a stenographer's verification of this fact, produced in this action by Ellan, and a certified translation are annexed hereto as Exhibit D.

43.   The newly revised Section 12.11 stated that the delivery of Limited's authorization letter would be made only after Dongkwang purchased the initial 55,000 – 60,000 units.   The proposed distributorship agreement nevertheless provided that Dongkwang's purchase of such merchandise could be from VS Merchandise manufactured within three months (or the same as new merchandise), and Nanjala promised us that she would give us documentation on behalf of Ellan setting forth Ellan's North American distributorship rights and Limited's authorization for Ellan to enter into the proposed distributorship agreement after we signed the distributorship agreement.   Furthermore, the WHEREAS clause in the proposed distributorship agreement stated that "ELLAN has the rights to distribute certain branded products it has purchased known as VICTORIA SECRET from The Limited Group . . .", and Section 12.9 stated that "ELLAN warrants and represents that it is authorized by LIMITED to enter into this agreement . . . ."

These representations provided us with additional assurances, and Dongkwang relied on such representations when executing the distributorship agreement that afternoon.

44.    Once Ellan and Dongkwang signed the Distributorship Agreement, Rich Kim, Ellan's President, handed Nanjala Warman several documents and she in turn handed me the documents. When Nanjala Warman gave me these documents, she informed me that they would verify that Ellan possessed North American distributorship rights for VS Merchandise and that Ellan was authorized to enter into the Distributorship Agreement.[2]

45.    Rich Kim and Han Kim did not actively participate in the discussions at the closing or in any of the other communications with Dongkwang. Substantially all of Rich Kim's communications to Dongkwang were made through Nanjala Warman, who appeared to be fluent in both Korean and English whereas Rich Kim appeared not to be fluent in Korean.

46.    Shortly after we received the documents from Nanjala Warman, we left AFB's office and returned to our hotel room. The documents provided to us were copies of (1) a No-Agent letter, (2) Victoria's Secret Inventory Purchase Agreement between Ellan and AFB, (3) Rich Kim's passport, and (4) Ellan's incorporation documents. True and correct copies of the aforementioned documents are annexed hereto as Exhibit H, Exhibit I, Exhibit J, and Exhibit K, respectively.

47.    After close examination of the documents in the hotel room, we were unable to verify that Ellan was authorized to enter into the Distributorship Agreement.

---

[2] Rich Kim's assertion that these documents were given to Dongkwang prior to the execution of the Distributorship Agreement is incorrect. These documents were given to us *after* the Distributorship Agreement was signed, not before. See Declaration of Rich Kim dated Oct. 11, 2010 ("Kim Decl."), ¶ 24. Furthermore, Rich Kim's recitation of the events that occurred at the closing on August 8, 2008 is substantially inaccurate in many other respects. See Kim Decl.,¶¶ 20-30. Most notably, Dae Ki Min played virtually no role at the closing, contrary to the elaborate, but untrue statement of events set forth in Rich Kim's Declaration. Id.

48.   The Victoria's Secret Inventory Purchase Agreement showed that Ellan only had access to VS Merchandise through AFB – the very company that we were told only had access to old VS Merchandise (and not Limited, as represented by Nanjala Warman).   Furthermore, according to the document, Ellan lacked the authority to distribute VS merchandise it would be purchasing from AFB outside its own brick and mortar stores.

49.   Nanjala Warman for Rich Kim had informed us following the execution of the Distributorship Agreement that the No-Agent letter was illustrative of an agreement that Dongkwang would be required to sign with Limited.

50.   The No-Agent letter showed that a company in Dongkwang's position would not be allowed to even purchase VS Merchandise unless permission was first given from the Limited, specifically denied any purchaser of VS Merchandise a license of any intellectual property rights of the Limited, and restricted the sale of VS Merchandise only through brick and mortar stores – all of these statements ran contrary to the representations that were made at the closing and in the Distributorship Agreement itself:  that Ellan had authority to sell VS Merchandise to Dongkwang, that Ellan would be able to obtain a license for Dongkwang to sell new VS Merchandise in South Korea, and that Dongkwang would be able to sell VS Merchandise through the Internet. Furthermore, Ellan did not possess any rights whatsoever under this document - Ellan's signature was merely at the end of the document as a "wholesaler," and there was no mention of any wholesaler within the document.

51.   Dongkwang was also unable to verify from the documents that Ellan possessed North American distributorship rights for VS Merchandise.  Dongkwang believed that it was important for Dongkwang that Ellan, as Limited's North American distributor of VS

12

Merchandise, could leverage its relationship to obtain a license from Limited to sell new VS Merchandise in South Korea.

52.   We were alarmed by the fact that none of the representations that were made by Ellan, Nanjala Warman, Shi Hyun Hong, and Hyung Wook Kim, including those in the Distributorship Agreement, could be confirmed.  In fact, it appeared that these representations were false.  Dongkwang immediately went to several Victoria's Secret Stores within the vicinity of the Millennium Hotel to verify whether the store personnel knew or were familiar with Ellan. If Ellan was Limited's exclusive North American distributor, we reasoned, then the relationship between Limited and Ellan would be common knowledge to the store managers.  When we asked the managers at several Victoria's Secret Stores locations, they informed us that they had never heard of Ellan and that Limited ran its own distribution network in North America.

53.   I was extremely anxious and distressed from the situation and so I contacted Dae Ki Min, Esq., the attorney who was present with us at the closing and part of earlier meetings on August 8, 2008, and informed him of the circumstances.  On August 9, 2008, Dae Ki Min sent a letter on behalf of Dongkwang to Ellan rescinding the Distributorship Agreement and informing Ellan that the Distributorship Agreement was null and void.  A true and correct copy of this letter is annexed hereto as Exhibit L.  Dae Ki Min's letter reflected Dongkwang's understanding that the documents that Rich Kim and Nanjala Warman provided did not prove that Ellan possessed North American distributorship rights for VS Merchandise nor that Ellan was authorized to enter into the Distributorship Agreement.

54.   On September 25, 2008, our Korean counsel, Changjo law firm received correspondence from Ellan's attorney, Gwangjang law firm (Lee & Ko), demanding that Dongkwang make an initial deposit of $300,000 under the Distributorship Agreement.

Gwangjang's letter characterized Nanjala Warman as Ellan's agent in connection with the Distributorship Agreement.  A true and correct copy of the Gwangjang letter and a certified translation is annexed hereto as Exhibit M

55.  On or about November 28, 2008, Changjo law firm received a telephone call from Nanjala Warman, saying that she was calling on behalf of Ellan.  Nanjala Warman stated that Ellan had terminated Gwangjang law firm as its attorney and that she would be the individual to contact as the representative of Ellan.  True and correct copies of the letter that Changjo law firm sent to Nanjala Warman confirming this conversation and its related letter sent to Gwangjang law firm are annexed hereto as Exhibits N and O, respectively.

56.  Ellan itself had taken the position that Nanjala Warman was serving as Ellan's agent.  A true and correct copy of an email dated 28 May 2009 from Rich Kim to Michael Sabe, President of AFB, admitting that Nanjala Warman was Ellan's agent in South Korea, is annexed hereto as Exhibit P.

57.  Dongkwang incurred costs of approximately $34,695 between August 4 and August 11, 2008 to visit Ningbo, China and visit the United States to sign the Distributorship Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  Seoul, Republic of Korea
October 29, 2010

_____
Jae Soo Lee

14